Case No. 17-1694, 17-1712, and 17-2062 United States v. Barry J. Cadden Okay, you can begin. Thank you, Arnold. Good morning, and may it please the Court, my name is Bruce Singlett, and I represent Barry Cadden. I would request four minutes of remote time, if I may, Your Honor. Okay. Let me start. Let me just say at the beginning, there's a lot of issues in the case, and so if my fellow panel members or myself maybe end up taking us a little bit over what the normal time is, we'll make sure that it evens out. Thank you, and I have in mind that we're cross-appealing in the sentencing, as you know. But let me start, Your Honor, with the unusual legal count here, and I start there because it really is, the way that count was structured and presented, really is the root cause of much of the irreversible error that we assert here. And as we pointed out, the biggest anomaly of that count is the fact that it mixes within one purported pattern of racketeering activity two mutually irreconcilable causes and courses of action. One is the no fraud scheme designed to sell as many drugs as possible through misrepresentation and thereby enrich Mr. Cadden. The dueling piece of conduct, though, is the second degree, the 25 second degree murder charges, which are wildly irreconcilable. The one is the consequence of the other. The argument is that the murders are the consequence of the fraud. What's irreconcilable about that? Irreconcilable because they have mutually exclusive purposes, Your Honor. If the purpose of the no fraud is to sell as many drugs as possible to enrich and make as much money as possible, that will come to a halt of necessity with murder charges where it's claimed that Mr. Cadden knew the drugs were probably going to kill people. And, in fact, as the government pointed out in their closing, Mr. Cadden stopped in its tracks that conduct they claimed through the activity comprising murder of others. Setting that issue to one side, on the 403 issue that relates, in a sense, to the same issue, could you just address that? Sure. The 403 analysis clearly supports our position here because when we're doing the weighting of probative value versus the risk of unfair prejudice, that balance tilts strongly in our favor. Particularly... Just so I understand how that works. One version of the argument that I gleaned from your brief, I think, but I'm not entirely sure, is that that argument is dependent on us making a finding that the murder counts should not have been given to the jury. That's one version of it. Or are you not making that argument? Well, that's part of the argument. You are making that argument. We are making the argument. Okay. And then the other version of the argument is if the murder counts were permissible to make a 403 argument even then. And one version of the argument that I gleaned from the brief is that you're saying that the evidence that was put in about the impact on the victims was prejudicial even as to the murder counts. Yes. Are you saying in that, can you win if that's not true? In other words, if they were not prejudicial to the murder counts, do you have anything left of your 403 argument? Yes, I believe we do, Your Honor. Okay. Could you explain how that works, that piece of it? It works in this way. The fact, and we recognize that what is unusual in this case is that we are claiming unfair prejudice. We are relating to evidence that was presented to support counts that the defendant was acquitted by. Clearly, that's different than most cases. But what we do have in this case is a situation where this evidence, all of this evidence as gruesome and as grisly and inflammatory and emotional as it was, and we detailed it under 403 analysis for either the murders or the fraud cases, and especially for the murders because there was no... Did you argue to the district court that part of the reason it should be kicked out under 403 is because it had no probative, because it would be prejudicial as to the fraud counts, even if it was probative as to the murder counts? Yes, we did, and that's supported by the district judge's rulings on the related fraud cases against the other defendants that were not charged with murder. And as for those defendants, he pointed to some of the testimony in our case, especially that of Dr. Park, the head of the CDC, and said this evidence was so heinous and it was so emotional that I'm not going to allow it in the purely fraud case against these other defendants. So why do you say this evidence relating to what happened to the victims' testimony about how they suffered and so forth, you say it had no probative value. I mean, essentially, with respect to the second-degree murder charges, the government was trying to establish depraved indifference. From their point of view, it went to the culpable state of mind necessary to support a second-degree murder conviction. So to say that it had no probative value seems to me a considerable overstatement. That evidence, Your Honor, I respectfully disagree with you on this point. And I think it went directly to the evidence of what happened to the patients to show the circumstances of their death. We have removed that issue entirely from the case by admitting expressly from the beginning, in the opening, during the evidence and at closing, that every one of those 25 victims named in the murder counts had died as a result of being injected with this drug that was manufactured at NECC. And so having admitted that and removed that as a disputed issue, there was no need of place for this evidence. Well, doesn't that make really no difference in the sense that the prosecution was entitled, wasn't it, to show that your client had knowledge of the risk that he was creating, that people would get very ill and perhaps die? He knew this. And so why isn't that a legitimate line of inquiry for the prosecution to be able to push? That could have been done, Your Honor, with one or two lines from one witness. And I don't think there was ever any dispute that when you inject a several injectable drugs into somebody's spinal column, if it's contaminated, it can seriously injure two people. It wasn't a disputed issue in the case. So your argument really is that this was piling more on top of more than was necessary. Is that basically what you're saying? Not really. There was more than necessary, but virtually all of it was unnecessary because it related to the circumstances after the drug left NECC, which were not in dispute anymore. But if I may, I wanted to turn briefly to the issue of the false evidence, the prejudice that was, the unfair prejudice that inflected the case as a result of the use. Before you get to the false evidence, could you address the sufficiency of the evidence on the NELS.com? Yes, Your Honor, I'd be happy to. And I think the best way to do that is... with respect to the NELS.com. It was not entirely clear to me from your brief what the ground for that objection below was. Is that a 403 objection? I would say it's a 403 objection and a relevancy objection, Your Honor. And our argument then and now is that the government's use of the standard operating, the internal standard operating procedures of NECC as the basis for the repeated references to fungal zoo and filthy mess and all the characteristics that they ascribed to the clean room was really improper because in every other part of the case, both when you read the indictment it's charged and the evidence it's presented, everything is predicated on the U.S. pharmacopeia. Excuse me, but the government put in evidence that marketing material from their client asserted that their operating procedures surpassed what was required by these industry standards. So if they are representing in an effort to sell their product, that they go beyond what was required, why isn't it entirely fair for the government to say that's not true? They did not abide by their own standard operating procedures. Well, because there was no reference to representations made to particular customers, named in particular counts. That's not relevant to the relevancy objection. That goes to the sufficiency of the evidence. Just on the relevance and the 403 objection, could you answer just because it's necessary? I'm sorry. Let me answer it more directly, Your Honor. The problem with the continual references to the extreme capitalizing of the clean room is that from the government's end, they really permeated the case and they were based solely on SOPs. The actual, and I recognize I'm intentionally correct that there were representations in some of the marketing materials as to exceeding USP, but the actual standard that was issued throughout the case were those industry standards of best practices set forth in the USP. And so it really misled and confused the jury to give them results based not on the most applicable standard, but on the more ambitious internal SOPs of NECC. Do you concede that there was evidence in the marketing materials of representations that they exceeded the USP? Yes, Your Honor. What there was not, though, and this goes to your earlier question about the sufficiency of the mail-forward evidence, Your Honor, is that there was no evidence tying in to the particular customers and the particular shipments named in the particular worldwide counts. Why is that necessary? I thought the law was, the government didn't have to prove specific reliance by specific companies. If they could establish that there was a natural tendency that individuals in the market would rely upon these representations, that is sufficient. That's the only type of reliance that they had to prove. Not specific reliance, but a natural tendency to rely on these kinds of representations. I agree with your characterization of the law, Your Honor, but you're taking it a step beyond where we are. And what we're saying is there's not even evidence of what representations were made, if any, to those specific customers, whether or not those representations were false. And why couldn't a jury infer that the representations were the ones that were contained in the general marketing materials? I'm sorry, Your Honor. Why couldn't a juror infer that the representations that were made were the statements that were set forth in the general marketing materials? Because that would have to be tied to some testimony showing that these particular marketing materials or these particular representations went to customers either in this particular area or in this particular location. They don't do that in their brief. Why would that have to be true if they're general marketing materials? Why couldn't a juror infer that they're general marketing materials? They're generally used. And if you want to put an evidence showing to the jurors that they weren't, you'd be free to do so. Well, the burden is on the government to show misrepresentations were made to the particular customers named in the particular category. This is a one-time indictment, Your Honor. You would not see the government coming in without putting on either a salesperson from any state or the customer to testify, here's what they told me or here's what they gave me, here are the representations that they made to me, and here are the effects on me of those representations. The government dispensed with all that because they were so preoccupied with showing what was taking place in the green room. And they can't dispense with that and have sufficient evidence to prove enough right now. Wasn't there testimony from some of the end users that the reason why they bought this stuff was that they had been convinced that it was of a higher standard than what other companies like this one were producing? Well, there was certainly some testimony from some customers that they did purchase because they believed they were purchasing products that were USP compliant or satisfactory safety standards. And some of those people testified that they would not have purchased this material if they thought that it was not only compliant but of a higher standard than was otherwise available in the marketplace. There was so much such testimony, Your Honor, but it was sparse. How much is necessary? I would suggest that for every count they wanted to prove, it was necessary either through direct evidence or through circumstantial evidence. Well, that's the question. Why wouldn't it be circumstantial evidence? The existence of the general marketing materials plus evidence that those were distributed in certain circumstances. Then a jury could infer, why would I think they weren't distributed to everyone? Because there were different marketing materials distributed at different times with differences in the representations made. And we don't know when they were distributed. For example, Scott Connelly, being a licensed technician, were they distributed during the year and a half or so or two years that he was in that status because they would not be false otherwise. You can't go, again, with one count, you wouldn't be deficient on this evidence. But they have dispensed with it because they charge all these counts, Your Honor. And I don't think that's satisfied. Take the one count, just so I understand that. There's one count of A shipment and there are general marketing materials and nothing more. Is that sufficient? Not without some testimony that those general marketing materials were distributed either to this particular customer or to all customers in this particular location. Something along those lines, I would admit, would do it. Juries routinely rely upon the general to draw conclusions about the specific. That's a routine process of reasoning for juries. I don't know why you want to change the rules in this instance. What I believe we're doing, Your Honor, is not changing the rules, but simply enforcing the rules that are requiring the elemental finding, the elemental proof that is foundational to a mail fraud evidence, a mail fraud case, namely what misrepresentations were made to the customer named in the particular mail fraud count and whether or not they were false at the time they were made. They dispense with that and the mail fraud evidence is not sufficient in the absence of that link. Are you saying that as to each of the mail fraud counts, you have to have specific evidence from an individual that I specifically received X and I relied on it? Not that I relied on it, number one. Number two, not necessarily specific evidence that I received, but for example, the government brief site's testimony of a salesperson, Ken Bono, to try to rehabilitate themselves on this issue. And Bono can only talk about customers in three states. None of those states are the ones that were at issue in the mail fraud count. So yes, I agree, there are ways that it could be done through indirect evidence, but the indirect evidence still has to tie in and be linked to the specific customers at issue. That was not done here, Your Honor. You wanted to speak about the false evidence issues and I moved you to a different topic, so I want to make sure you get to it. Thank you, Your Honor. Let me say briefly that the deficiencies that we have pointed to from the inception in the murder case were that there was no evidence, essentially, that Caden caused the contamination that resulted in the deaths of these people or that he knew those drugs were probably going to kill people. It is our belief, when you look at the evidence we are pointing to, that the government attempted to shore up both of those elemental deficiencies with evidence that it knew or should have known was false and that it failed to correct once it became obvious it was false. Excuse me, did you just say that there was no evidence that Caden caused these deaths? Is that what you just said? That is what I said, Your Honor. There was generalized evidence of conditions in the cleanroom that were deficient, no question about it, and those conditions could theoretically or potentially lead to difficulties, but never was there any evidence of how the particular warts, fatal warts in question, became contaminated or what, if anything, Mr. Caden did to cause that contamination, so that is the absence of any causation evidence in terms of his... Mr. Singel, isn't it enough that he said, ship, ship, ship, and even when he knew that the testing hadn't been completed? And the testing, as I understand it, is the way you know whether the particular vial is contaminated. Well, the results of how you put it, Your Honor, ship, ship, ship, and we agree it was certainly an emphasis on increasing volume, making money, making profits, no doubt about it, but let's look at the evidence of what that ship, ship, ship consisted of, and that was when NECC made methylprednisone acetate or similar sterile injectables, and those 144 warts generated 859,000 vials of that drug, and there was no evidence whatsoever during that six-year period, just up to the time where the fatal tragedy occurred, none of those had caused any problem at all, so there was no reason to believe it would go to people. Reportable problem that you knew of. Reportable problem. Well, but the evidence of record, Your Honor, is nothing. Nothing. Clean sites for six years with that number of vials, 859,000 vials, and one of the technicians in the clean room, O.J. Finnegan, testified, he made the methylpred, that issue, he said I would have injected myself with that methylpred, that's how comfortable I was with its safety, so we don't see how you can impute to the knowledge necessary. Of course, the district court judge at sentencing said the government hadn't even come close to presenting the knowledge that was necessary, and that was on a compliance of the evidence. Did you, you must have moved to quit on the murder predicates prior to going to the jury? We made a Rule 29 motion. And that was rejected? Yes. What was the grounds for rejecting it given what the district court said at sentencing? That there was sufficient evidence to have it go to the jury, and perhaps there was some comment, I'm not sure about this, that it could be revisited after a verdict if need be. The record indicates, there is a record of the jury votes on these predicates, and that record indicates that in some cases there were eight jurors who thought the predicates were most apt, there were six and so forth. Now, I realize that they did not convict on the predicates, but there were jurors who thought there was a lot of evidence there to support. Isn't that so? Well, two responses, Your Honor. First is there were certainly numbers scroll on the verdict slip. There was no record evidence of what those numbers were comprised of. And there was evidence that the judge properly instructed the jury they had to arrive at a unanimous verdict. And the jury reported they had, and the verdicts were accepted. Secondly, though, even if you accept the premise that those represented some tally at some point in time, even at the end, all that does is show how prejudicial the inflammatory emotional evidence was that we pointed to, because that number of jurors, if it was the case, could have been inclined to vote guilty on one or two charges in the wake of evidence that sufficient helps prove the inflammatory nature and the unfair prejudice of that emotional evidence. This is the last question that I have, but if my colleagues still have questions for you, they can ask them. If I understand this version of the theory, there was insufficient evidence to support the murder counts at least going to the jury, even if there might have been enough to permit the indictment to extend and not be dismissed. One way of thinking about that is that would then set up a retroactive misdemeanor claim. Did you make a retroactive misdemeanor claim to the district court? We did not explicitly make that argument, Judge. What do you mean you didn't explicitly make it? Well, I didn't explicitly make it. Well, that's a fair follow-up question to my less than direct answer. I think the substance of the argument we made comprised many of the elements of retroactive joinder without as sophisticated a fashion as we should have labeling it as such. Am I right to read the government's brief and not contend that you waived or forfeited the retroactive misdemeanor argument? They certainly contend that our argument was in the nature of retroactive joinder. I'm not sure about the second part of your question, so I hesitate to answer it. I, of course, wanted to get to sentencing, but if my time is up now, I will wait for a rebuttal. We'll wait for a four-minute rebuttal unless you interview another hearing about sentencing. You do propose to address the sentencing issues at that time. Is that correct? I do. I was hoping to get to them now, but I didn't plan my time well enough, I'm afraid. Why don't you talk about the sentencing issues? We'll give you a few minutes to talk about that. Let me get right to the critical issue, and that is the government said for calculating the lost figure it should be gross revenues of all sales of NECC per six-year period. The court said no and limited it to the $1.4 million comprising those particular drugs that have been identified as deficient in the evidence presented. The reason the government is right is that all the other drugs that were sold based on the evidence of record had the value that was ascribed to them, and the customers got what they intended to get, namely a drug that was used safely and effectively to treat the particular injury or pain that was diagnosed for that patient. Counsel, can you help me understand something factually? I think it's probably important to your argument. This company, there's some reference that they had over 7,000 different products or something like that, and a small subset of those involved the kind of compounding products that were at issue in this case. My understanding is that there were many other products that did not have to be produced in a sterile environment, that were not subject to these USP standards, that simply were creams and ointments that were vastly different as products from what we're talking about here. Is that correct? That's correct with the one exception, Your Honor, that all drugs were compounded in NECC, but the case as charged and the case as presented was focused principally on the sterile injectables like methylprednisol and acetate that were injected into the spinal cord, and everybody acknowledges to kill people if it was contaminated. Most of the drugs that NECC compounded and sold were not sterile injectables, did not pose the same dangers, and were not subject to those aspirational standards in USP 797. So to take that to one of many reasons why gross revenues of all sales is a wildly overbought characterization. But why not? Why is it? Because wasn't there testimony from some of the purchasers, they wouldn't have bought anything from this company if they had known about the sterile condition problem, which apparently existed in the clean room. So why didn't that make all the sales invalid? Because none of the cases, Your Honor, that deal with these issues, the Gonzales-Alvarez case, and the Inacio case in the First Circuit, and the Fourth Circuit cases that the First Circuit embraces, none of those dealt with a situation that did not involve an identical defect or problem with a specific drug at issue. And those cases where courts held drugs were in fact worthless were plagued by such a particular deficiency. In our case, those were all accounted for as part of the $1.4 million the judge tabulated based on the evidence. I've got a relevant legal provision that's determining what I look to determine loss. What is the actor or the subject that creates the loss under that provision? In other words, I can imagine, let me give you three options and you just tell me what the text of the thing says and how it tracks on to it. One would be the fraudulent scheme. One would be the defendant. One would be the conspiracy. One would be, I guess, also the enterprise, the racketeering enterprise. Which of those is the thing that's causing the loss under the guideline that I'm supposed to look to? Because that might matter a great deal for determining how big of a loss I would calculate it to be, do you see? I usually run multiple choices on it, but I'm struggling with this one. I do think that probably the most correct answer to your question is that it's none of the above in the sense that... What does the relevant provision say? The loss created by what? The loss, we say... Not what you say, what does the text of the legal provision that we're interpreting say? The loss resulting from the criminal conduct. The criminal conduct, okay. And here the criminal conduct is male fraud and the loss resulting from the male fraud... And there's a conspiracy count, right? Conspiracy conviction. Conspiracy to commit recall based on the male fraud predicates, yes. Yeah. And does that then... What does that conspiracy encompass? Because that will then tell us what the loss is, right? The loss flowing from that conspiracy, that would be the broadest. Right. It was essentially a conspiracy to commit male fraud because the recount too, the recall conspiracy count expressly confined itself to the male fraud predicate acts and did not include the murder predicate acts. So the loss here is the loss that cabin caused two victims arising from this criminal conduct namely the male fraud, and of course the judge found the victims were not the ultimate customers because NECC had no interaction with them. And the male fraud counts as charged were defrauding the customers by false representations which effectively said... Which effectively said, but that's how you would get to the proposition that we should look at only the shipment of the tainted goods as opposed to all the creams and other things that had nothing to do with the cream. Yes. So I gather at one point in the two first circuit cases and the two fourth circuit cases that your court has averse, yes. I know it ultimately gets to sentencing but does it make a difference as to how we look at the victims, whether we look at the victims as the people who were injected or the institutions that bought? Doesn't that make a difference? I don't think it does respectfully your honor. It removes one of our arguments that they are victims but the government has still been there with a body of evidence of drugs that were sold to those victims of the customers who received a drug that was safe and effective for therapeutic use and was what it was purporting to be. So there is no case the government can point to where there wasn't a specifically identifiable fraud or defect relating to particular shipped drugs that made them part of gross revenues and in this case any such drugs were already accounted for by the courts 1.4 million dollars of loss of any and all deficient or defective drugs. Counselor, your position seems to be that there were a large number of products sold by NECC that did not involve the kind of misrepresentations that were at the heart of the various fraud charges. To the extent that's true, the government's theory that nobody would have bought these products if they had understood that misrepresentations about sterile procedures, proper testing, that just doesn't hold because most of the products sold, those kind of representations were never made. That's essentially your argument as I understand it. Certainly as part of our argument, your honor, yes, but no customer presented by the government is going to come in and say, oh yes, I had known that A, B, and C were the case resulting in deficient manufacturing processes. Sure, I would have gone ahead and bought the product. I don't think that is particularly qualitative in terms of the more fraud scheme that's charged here. Thank you. So I realize we've given you a fair amount of time. We'll make sure that we don't cut you shorter than we need to. Thank you, your honor. Good morning. May it please the court, Dave Lieberman for the United States. Let me start with Mr. Cadden's primary claim, which is about the second degree murder of credit.  Yes, the jury did not agree with them, but that doesn't help somehow retroactively invalidate the counts of which they did. Before you go on, just so I understand what argument you're refining, your part conceded that they did not make a retroactive misjoined argument below. I don't need your brief to have said they waived that argument. That's correct, your honor. I made that. You seem to treat them as having made a retroactive misjoined argument. Yes. So in the government's view, that's just an issue before us right now with ANOVA. Yes. Whatever the preserved standard is. Exactly. I believe Mr. Signal said a number of these points did not use the term retroactive misjoined argument, and I think that was enough to put it in place. So you need to survive that retroactive misjoined challenge. You need to show that the mens rea and causation elements of the second degree murder predicates for the recall charges were adequate for the case to go to the jury at the time of their rule 29 motion. Yes, and that was our position in our brief. I think your honor, I want to have the dichotomy for evaluating this claim, the second degree murder predicates and then everything else. On the second degree murder predicates, we charged them. The second degree murder is a proper predicate of recall. We were then allowed to put in relevant evidence. At the time that it went to the governor of the jury at the time of their rule 29 motion, given what had happened to the Huffman testimony, what was the basis for thinking that it was sufficient evidence at that point to find the defendant guilty of second degree murder? So there are two points. It really comes down to causation and intent. Causation, the racketeering enterprise, including the patent at the helm, distributed these contaminated medications, knew that they were not manufactured in compliance with their own assurances and the USP, and Patent knew that doing that would place patients at risk of death. That was the testimony of a 2002 FDA investigator who told Mr. Cadden, if you don't test properly, patients could get sick and die. In addition, the jury heard testimony that Mr. Cadden instructed his sales reps to go out and tell prospective customers, your legal department wants your institution to outsource the risk of these drugs to us. What is that risk? The risk that these high-risk compounded drugs, if not manufactured or tested properly, could be extremely harmful and, in fact, fatal to patients who receive them. I believe there's even videos in the record of Mr. Cadden making these claims when training sales reps. So we had, we think, very persuasive evidence of both causation and the intent associated with second degree murder. And the mens rea that had to be met is what? Every state, because it was predicated on state law, so it is this extreme form of recklessness, wanton and reckless disregard of a serious risk of death. I'm summarizing because each state treats it a little bit differently. But for purposes of the legal predicate, what was the jury instructed that the standard was? The jury was instructed, for each secondary murder predicate, the jury was instructed on the language used by each secondary murder, the state where the patient died, as to the mens rea. And so it's a little bit different, but it comes up to that wanton degree of recklessness language that I just quoted. We had more than enough evidence to go to the jury. On different counts, they got different instructions as to the degree of mens rea. Based on the state associated with the secondary murder predicate. Counsel, the relevant state of mind is summarized as depraved indifference. Isn't that correct? That's correct. And what is it depraved indifference about? Is it indifference as to the risk that without proper testing, without proper procedures, something terrible will happen? Is it indifference to the suffering that will result if somebody is affected by the contaminated drugs? What does indifference go to? So the wantonness standard goes to the fact that Mr. Cadden knew, well back in 2002, that if his enterprise distributed the drugs in the fashion that they did, there was a seriously high likelihood that people would die. That's what the FDA investigator, I believe it was Casey Guillermo, in 2002 told Mr. Cadden because he was not properly testing at that time. Well how does the, I don't mean this to be in any way insensitive, but if that's what the indifference is about, the risk that these bad things will happen, what is the relevance of the way in which, I understand there was testimony from family members about how individuals suffered, which was obviously terrible behavior. I mean how is that relevant to the state of mind that the government had to prove? I think it's actually more relevant to the causation point, which is the government gets to put on evidence as to how the offense conduct ultimately resulted in these patients contracting meningitis and dying. But he said that they stipulated that it did. They offered us, they offered pre-trial a generic stipulation to that point. We did not think it was sufficient, and under this court's decision... But what would be left for a mystery as to causation for the jury once that stipulation is made? I could see an idea that you need to spell out the details of Habitat for Purpose as a prudish state of mind, but if you're focused on causation, I'm not following why it would be important once there's no dispute that it caused the death, why it would be necessary to spell out the particular mechanism through which the death occurred. Because this court said in Tabar that the defense can't stipulate the government's case on a particular offense. They're not stipulating the case. They're stipulating a piece of the case, just the causation point. And I'm still not hearing an answer as to what it was that would have been probative of causation given the prejudicial impact in a situation where there's no dispute on causation. Two responses to that, Your Honor. First, even assuming that the defense in the government's view offered an appropriate stipulation, we don't have to accept it. That's what this court said. You're just saying things about an authority not to do something. I'm trying to get out what substantively, functionally was useful that would be helpful to the jury to know when the issue of causation has been stipulated. Given the risk of prejudice from that information, the district court thought it was so prejudicial he wouldn't allow it in if it wasn't going to be helpful in proving something. That's why he doesn't let it in on the fraud counts alone, right? So what is the story you could tell as to why it would be useful for the government to be able to lay out how it was caused that the stipulation that it was caused wouldn't convey? Your Honor, I agree that a stipulation could largely take care of that. But the point is we can reject the stipulation and put on the evidence of causation. You can reject it. If it's rejected, you can incur the risk of a 4-in-3. Exactly, Your Honor. And the way that the district court handled this was appropriate. He limited our presentation on the second degree murder counts to three expert witnesses, one medical examiner, and two CDC witnesses. He also invited Mr. Catton pretrial, in a pretrial order, to make 4-in-3 objections to specific testimony. You don't make an argument on the field that there's anything other than a preserved 4-in-3 objection, do you? You didn't see that in your brief. Because we're viewing this as a retroactive misdemeanor. This is sort of transformed today into a 4-in-3 objection. Are you saying they did not make a 4-in-3 objection? They seem to be backdooring the 4-in-3 argument into the retroactive misdemeanor. You do point out in your brief that, despite the invitation from the judge, when the specific evidence came forward, they did not object to that specific evidence. We do have cases where we have said, if there is not an objection to the specific evidence when it's come forth, then that could create a plain error situation. Do you argue for that? To the extent that the court is construing this claim as just a standalone 4-in-3 claim, tell me, below, did they make a 4-in-3 objection? No. Not to the specific testimony about Dr. Park? That's not what I asked. Did they say that all evidence of... Once the stipulation was put forward, there would be no need for any of the other evidence. That stipulation is objective. What did they then say? I'm just having trouble. You're saying they didn't make a 4-in-3 objection. They say they didn't make a retroactive misdemeanor objection, yet we're on appeal. Somebody must have objected to something. They objected broadly at the start. None of this murder evidence should be allowed in. Okay. The district courts rejected that. Why isn't that a standing 4-in-3 objection? Because the district court then says, in order, to the extent that there are any particular pieces of testimony that you can cross the line on 4-in-3... But that's just a backup argument. Why wouldn't the right way to construe that be we object to all of it? That's a standing 4-in-3 objection. I've rejected that. If you have more particularized arguments for why you would like to object, you could bring those, too. But that wouldn't remove your standing 4-in-3 objection. Otherwise, that would preclude the defense from being able to make a standing objection. I agree, Your Honor. But I understand that there's a preserved 4-in-3 objection. If that's the case, then we still believe there is no district discretion. The district court commended our presentation on the murder evidence as delicate and undramatic. And he was so emotional that he wouldn't allow it to be on the case. Because there was no charge there related to the mental pregnancy. In Trial 3, I can't remember the defendants in Trial 3, but those defendants were not charged with any counts. Not just legal counts, but male-file counts related to the mental pregnancy. And the district court, in the order that opposing counsel references, seems to reaffirm his decision to allow this evidence to be tabbed in trial. So, if I could step back, though, this is all about the retroactive misdemeanor framing that. So, this is now about the 4-in-3? Yes, Your Honor. Can I just go back, just to clear something in my own mind? You mentioned that there was a 2002 statement to the defendant about the risk of the drugs that he was going to compound. At that time, it was a very small operation compared to what it was in the appropriate time for this case. Was there any other government statement to him that's in the record anywhere where the risk was set forth to Tatum? I'm not recalling one off the top of my head. I haven't found one as yet, so we're really relying on that as part of your foundation. Also, the fact that it's undisputed that he had knowledge of the USP, which says many of those same things, including the fact that mold contamination in the clean room is most dangerous when injected into people's bodies. Can I shift back to Judge Barron on the 403 point? Okay. The district courts over a repeat of it, and this goes into some of the presbyter's conduct claims, the evidence related to all of this, the jury acquitted it. And so the question is, does it filter, does it somehow taint the fraud counts that the jury properly found? And the answer is no. The district court instructed the jury to consider each count separately, compartmentalize its review. The jury here, as one of your honors mentioned, the jury verdict issue is one of the most discriminating jury verdicts that I've seen in my practice. The jury acquits Mr. Cannon on several substantive counts, acquits Mr. Cannon on two of the secondary murder counts, and then on all of the remaining secondary apprentices. Three courts have a wildly different tally. I think Judge Lopez, you noticed this. Some favor the government, some favor the defense, and they're all different. And that is powerful evidence that the jury was able to conduct a compartmentalized review, even with the murder charges and associated evidence with that, and still reach a fair verdict on that. And so I don't think on the four or three issues that the jury was able to compartmentalize. It does not find Mr. Cannon guilty of the secondary murder predicates. But it's able to go count by count, and this court routinely presumes that a properly instructed jury can do that. And, again, the jury verdict here- So did it acquit on any of the non-murdered predicates? Yes, it acquitted on several of the FDA- FDA predicates. Yes, yes. But all of the male products it convicted on. I believe that's the case, yes. So with that record, I don't think there's any basis to find that the district court abused its discretion in handling this. What's the part of that record that's helpful to you in showing it wasn't prejudicial to all the five counts? Because the jury- This is in the prosecutorial misconduct section of the district court's new trial order, but it says that the evidence- the court says it has evidence about the different murder- that the government presented about the murder counts. It really just went to the murder counts. It didn't sort of filter over. And if that's the- And that's really my point here, that jury's properly instructed. The issue of discriminating verdicts, not just on the murder counts, but on the prosecutive counts. And so even if there was error in admitting evidence that went to those murder specifications, it did not take the counts of conviction. I love sentencing. Yeah. Can I just- They're also- Could you talk about the sufficiency of the evidence on the male side? Yes, Your Honor. I just want to make sure we run through with you what we ran through with. So the claim here is that the jury had to hear of reps from every hospital and every clinic to find males on it. That is incorrect for largely some of the reasons that- I heard them to be saying that there were general marketing materials. Correct. And that that's not enough. We disagree with that, but we also had a little bit more. Wasn't there also the argument that there was really insufficient evidence that the general marketing materials went to people who were involved actually in what happened, who had the resulting deaths, and that there was no evidence as to those purchases having received the materials? Yes, Your Honor. But the male fraud counts are vis-à-vis the hospitals and the clinics, not the in-line patients. And how much evidence is there of the marketing materials having made their way to those hospitals and clinics? So two buckets of evidence. I'll give it to you. First, the jury heard from three folks involved in marketing, two sales reps, Mr. Gianni and Mr. Bono, and the head of sales, Mr. Wanzi. And they testified that every time they went out to meet with hospitals, they always asked about USP compliance, sterility, testing. Mr. Padden developed marketing materials for these sales reps to use on all those visits to say we are meeting or exceeding USP standards. We have a state-of-the-art facility. Let me do two things so I understand. The way you just described it, and this might be relevant to their 403 argument on the SOP evidence, every time the marketing agents went out, you said they made statements about the USP compliance. Is there any evidence that they, every time they went out, made representations that they were exceeding the USP requirements? I don't think the testimony went that specifically on it. Well, doesn't that potentially create some basis for their 403 objection to the evidence of the SOP? I don't think so, Your Honor. What would be the evidence that would suggest that any customer heard what was in the marketing materials about them exceeding the USP? So the core of the fraud house was, in fact, deviating from the USP compliance. But our broader fraud scheme included the meet or exceed language. And that was just generalized evidence. You know, you've got two different things going. I'm running together, so I recognize that. But on the one hand, there's the sufficiency of the evidence in the Nail Fraud Counts. If I understand you right, you're saying there was sufficient evidence to show that representations about compliance with the USP was made widely. Correct. And therefore, you say there's sufficient evidence to support the Nail Fraud Counts? Yes. They make a 403 challenge to the inclusion of the SOP evidence. One argument as to why they're wrong on that is that the marketing materials say we meet or exceed the USP. That would suggest there was a basis for thinking that there were representations made about them meeting the SOP. But when I asked you for evidence that the marketing materials made its way to customers, you said the evidence shows that people went out and talked about compliance with the USP. That sets up, I think, their contention about the problem with including the evidence on the SOP. Does that make sense? I understand you. I think I'm on track. There were marketing materials that talked about NECC meeting or exceeding USP compliance. That's in the record. That's the general marketing material? One of the marketing material brochures, I believe, says that. What is the evidence that that representation made its way to customers? The sales reps testified that the marketing materials, they dropped them off and they went on these visits. Always? Sometimes they didn't. Sometimes they didn't. I mean, what's the evidence? The sales reps just testified this is what NECC developed for us to give to customers. Relatedly, we called 10 witnesses, hospitals and clinics, to verify that they got the standard marketing materials. And so what I gather is I don't think it's a requirement that we have to call 15 or 20 additional witnesses to say, yes, we received these standard claims. The jury could fail in for, based on the evidence, connecting the sales reps' testimony, the materials in the record, and the testimony received from the hospital reps who did testify, that these were generalized marketing claims that NECC had its sales reps. Counselor, how many fraud charges were there, convictions? How many fraud charges? I apologize. I do not remember at this moment. Sixty-something like that? Does that sound right? Can I just check with Procom? Fifty-seven. Fifty-seven. Okay. I gather it's your position that in order to provide sufficient evidence with respect to each of those, you did not have to provide evidence in each instance that they had received marketing material that touts compliance with USP or even compliance with standards that go beyond that. Is that your position? As long as you could do it with respect to enough of the companies that purchased the product, the jury would be entitled to infer if it happened in those, you said there were maybe 20 witnesses, that it also happened with respect to the other 37. Is that true? Yes. That is the argument that this was a standard marketing claim. The sales reps were not presenting individualized material. I thought the evidence showed that the general marketing material did not invariably make it to the customers, that that was basically conceded by some of the witnesses you put on. But nonetheless, those witnesses testified with respect to USP compliance that they always made representations about USP compliance. So the problem I'm having, and I'm trying to get your help with, is the gap that's created between the USP representations and the SLP representations, which I think relates only to the 403 objection. Do you follow? I think I follow, yes, Your Honor. So in other words, it may be the case that you could have the jury infer that everybody got the representation without proving everybody actually got it. On the sufficiency point, yes. But the way you get there is by evidence that shows the general marketing materials did not always go to everyone, but sales reps were out there making representations, supplementing. But those representations, the testimony is concerned, the USP. Was there any testimony that when they mentioned the USP, they also said, and we need to exceed the USP? So Mr. Bono and Mr. Giambi testified that just one of their stock marketing claims was, we need to exceed the USP. They didn't go into great detail. There were no questions about did you tell that to everybody or was that individualized. They just said that was part of the training that CADA gave to them when they interacted with customers. And so we think that answers both the sufficiency and the 403. In any event, it would be harmless error because even if you remove the evidence, what the SOPs are evidence regarding the fraud with respect to the USP was overwhelming. Unless there are also some misconduct allegations that have been referenced and a number of other guilt-placed claims, I'm happy to rest on my briefs and answer any concerns before moving on to sentencing that the panel may have. I think people would like to hear about sentencing. I'd like to hear about sentencing. Can I get straight to the loss issue? In the government's view, it should have been the full amount of drug sales during the racketeering period. And addressing Judge Lopez's question specifically, the non-sterile creams, ointments, that is not in the record below. There was a brief reference at trial to NECC had a non-sterile room and made creams. But that was not excluded at all at sentencing in terms of whether or not there should be a carve-out for those products. All of the representations that formed the basis of the mail fraud, those marketing materials and the sales drafts, they should have gone out and said all our formulations are USP compliant. They are a high-risk compounder. And so in government's view, what was before the district court was they were distributing high-risk dangerous compounded drugs and the full price of those products represents the loss. We did note that if this court remains to be sentencing, we have no objection to Mr. Penn pursuing this point and making a record of this point in a resentencing proceeding. But to the broader point, what should be the loss in this case? The government's argument is very straightforward. Excuse me. Yes. I want to try to understand what you just said. Were you suggesting that to the extent they want to more fully develop the proposition that many of the sales that you say should be treated as part of the loss calculation involve the sales of the creams and the ointments and were not subject to representations about USP and SOP, that they should now have a chance to do that? No. My only point was if this court remains for a full resentencing, I don't see anything that would preclude the defendant from trying to develop that point in a resentencing on loss. If the court agrees with the government's position on loss. Do you have any argument as to why your position on loss should include things like cream? No, Your Honor. Why is it incumbent on you to define the scope of the loss in some less than obviously overbroad way? If you don't have any argument as to how cream could be part of it, it seems odd for you to say we should say that the right answer is loss includes the creams, but if you want to go back and show they don't, go ahead. My response to that is this was not, all the evidence presented below was with respect to high-risk compounded drugs. So you're saying you would like us to say the loss should be defined by the value of the sale of all like drugs, whether tainted or not. Yet you have to keep that. What is the valuation of that? You haven't given us that valuation. You've given us just the gross profits as a whole, right? You've included the creams in the number you're asking to be the loss number. Your Honor, we... Yes or no? Inevitably you did, right? Because you haven't tried to sort it by just the amount that is tied to those types of drugs. Isn't that right? Yes, because we didn't know the creams were an issue until... It's not about the issue. You have to make an argument to us as to what the universe of the criminal conduct is and what the number that attaches to it is. The number you chose is not attached to it because you chose a number that includes things that are not part of those drugs. No, we are not trying to include non-sterile products that have no... that are not tethered to the U.S. DNA anyway. So the judge not looking at gross sales was correct? The judge should have looked at gross sales during the vacaturing period of the high-risk compounded... The high-risk drugs, not the rest of them. Correct. But in the government's view, there was virtually no... The number you gave was not tied to that amount. Because we had no knowledge that this was a large part or any part of NETC's business. It was mentioned in passing by one witness at trial. We thought and we still maintain that this enterprise was about high-risk compounded drugs. That was what all the marketing material said. And we proceeded to trial and sentencing on that understanding. And without any... The crazy issue really just comes up on appeal. The district court took the view, and he says this, that until these horrible events in 2012, this company had a good record. And it was selling these high-risk drugs for years and nothing bad happened. And I think his point is that through that long period of time, these customers got what they paid for. They got safe drugs that performed as they should have. And so how can you, in doing the loss calculation, say in effect that all those safe drugs were valueless when there is no evidence of that effect other than what seems a rather speculative proposition. Well, if we had known that these representations, if we accepted that they were good drugs, if we had known they weren't really being produced in a sterile fashion, we wouldn't have bought it. What's wrong with the district court's... Excuse me, that is what the district court in a sense was saying. These customers got value. What's wrong with that? So can I... Can I just shorten the time period? We're not seeking drug sales for all time. Just for the racketeering... The period that the racketeering... Your figure goes back to 2006, doesn't it? 2006 to 2012. That's what we asked for in district court. The district court found that the racketeering period was 2010. So it's not... What was that figure, $136 million? What is the figure that you're asking for now? I have all these numbers mixed up in my head. We outlined it very clearly in a brief. The district court shortened the racketeering period because it was only 2010 to 2012. Did you give him the numbers that were equated to that amount of time? Yes, yes. And that's the number you would now like us to define. We outlined all the iterations in the brief based on the timing that the racketeering period starts. The best support for that is the Gonzalez-Alvarez case from this circuit and then the Marcus case in Bhutani. In those cases, as here, the defendants were selling their products with no complaints for the contaminated milk, the heart drugs, the other medical pills. No complaints from patients. The cost of that contaminated milk, it was all the milk. I mean, it was clearly valueless. That's not like this case where you have... Now, you may have drugs that were sold on the basis of exactly representation, but there's no indication that these drugs were contaminated in the way that the adulterated milk might have been contaminated. The argument is that these customers got the value of what they paid for. But to screw you on it, because there was undisputed testimony that hospitals and clinics do not buy and administer pharmaceuticals, high-risk pharmaceuticals, that are not manufactured and tested in accordance with the USP. That is exactly analogous to the tainted milk in the sort of unchallenged world. Hospitals and clinics cannot administer something of unknown safety or unknown efficacy, and those metrics are established in this setting by compliance with the USP. These hospitals and clinics expressly bargained for drugs that were USP compliant. They did not get those drugs. That means that in the government's view, that the full purchase price represents the loss. I just have one more presentation, which is on the proceeds from the wife. Yes, Your Honor. Could you just address that? We are trying to... What I would like you to do is just walk me through the text of the forfeiture provision and why, under the text of that provision, the wife's proceeds should be understood to fall within it. Yes, Your Honor. The legal section authorizes forfeiture for property and proceeds obtained directly or indirectly from the racketeering activity. The wife's proceeds are proceeds of the racketeering activity. They were during the relevant period defined by the district court. Yes, but if the wife had put those in her own name or in her own account, you wouldn't be here claiming that this is something you put forward. That's exactly right, Your Honor. So the only reason that you can do that is your position that once she put it into the joint account, it became his for forfeiture purposes. Yes. When those funds landed into an account that was in his name, that he could access, control, spend as he wishes, he obtained those funds. He acquired those funds. Once she put them in, they were proceeds of the racketeering activity, and then once he got access to the account, he obtained those funds. That's the idea? Well, they were always proceeds of the racketeering activity. Okay. So let me rephrase this first. Can I take this a little further? Yes, Your Honor. Let's assume that she had decided after the money had gone into that joint account that she was going to take all of the money out and put it in her own name in another account just because she decided to do that. Would you then be arguing here that you could somehow reach, without anything further, reach that money which she is now putting into her own name? I think the record shows that she transferred it out, comes in and transfers it out such that Mr. Penn had no ability to, couldn't access it, and he never acquired it. So, therefore, you would agree that once it was in her name, it would be hers, and the obverse of that is obviously what you're claiming now. Since it's in a joint account, it's available, the entire amount. Yes. Our further request depends on the fact that this money was in the joint account. I just want to be clear that the government is not trying to seize this money, attach this money to this program. I guess I'm having a little trouble with how this relates to the subversion of what we were just talking about on loss. Is it the case that every dollar coming out of NECC is a proceed of the racketeering activity? Yes, Your Honor, during the racketeering period defined by the district court. No matter what, even if it was doing some things during that period of time that was not racketeering conduct? That is the government's position. And what's the best authority for the idea that everything NECC does that results in a payout to anyone is a payout of racketeering proceeds? The NGLO case from this circuit where the court held that the maker's statute requires the defendant to appropriate his full interest in the enterprise. It's your position, isn't it, that you can't meaningfully say that part of this business involved racketeering and part of it didn't. It's your position that the entire enterprise was involved in racketeering activity. That's the thrust of your regular course of business argument, that it was the regular course of business to engage in this kind of racketeering activity. I thought with respect to loss you were taking a somewhat narrower position, which you were saying that the racketeering conduct related to the sale of high-risk drugs. So if that's the case, how does that relate to the proceeds point? So, first of all, the government's position is any drug that, whether the U.S.P. So not everything that they did? Yes. Now we go to proceeds. She got paid out of NECC profits, not all of which were derived from the high-risk drug sales. So why are all of the payout to her proceeds derived from racketeering activity? I'm not saying you're wrong. I'm just trying to figure out why you're right. What's the reason for that? So Angelo says that the entire enterprise, we don't slice up, we don't do a peak analysis, 60% was, 70% was racketeering, 30% was non-racketeering. That was the statute that Congress passed, and that was how the Supreme Court interpreted it in Angelo. Would it make a difference if the joint account had existed, say, for I don't know how long it existed. Let's assume it existed for 10 years, and the money had been put in the joint account in year two of the 10 years, and nothing more had been put into the joint account thereafter. So none of the money that went into the joint account came from the tainted drug sales. Does that make a difference? If the money came in before the racketeering period defined by the district court, then we could not get to it under our interpretation. It has to have been deposited during the 2010-2012 period where the district court said, found, NECC was acting as a racketeering enterprise. So the money had to go in during the racketeering enterprise period found by the district court. Yes, and the district court's order outlines very carefully the sums of money that went in in Mr. Catton's name as well as Lisa's name, and we think all of that is included in the top line of forfeiture capitulation liability for Mr. Catton. We, of course, are not trying to adjudicate the exact status of those joint account funds. That will depend on future litigation. Yes, an ancillary proceeding where Lisa Catton can participate and assert any defense that she might want. Counsel, if we were to accept your position about what the loss calculation should be, what the risk of death enhancement should be, what the vulnerable victim enhancement should be, what kind of a guideline range are we now talking about? Again, I'm sorry, I cannot remember exactly. I'm happy to submit a supplemental letter saying exactly how the guidelines. Is it in your brief? I think so. It is certainly in the sentencing below. Well, there's a suggestion we're talking about the sentence could be a life sentence. Isn't that correct? That's correct, Your Honor. Depending on how the court rules on the many guidelines issued in this case. Before you sit down, one last question from me, which is you referred to this case full racketeering enterprise and that there was a finding that NECC was a full racketeering enterprise or just was a racketeering enterprise. It was a racketeering enterprise. Not the full. Right, and my point was in general. A racketeering enterprise is defined with respect to the predicates. Yes, as well as sort of the manner and means, all the things that we elect in the indictment about fraudulent distribution of narcotics. Thank you. Thank you, Your Honor. Let me start with where we almost just finished there, and that was what the government's proposed sentence was under the last figures that they used. For the essentially, not essentially, but fraud convictions that Mr. Cannon was convicted of, the government asked for a sentence based on their last calculations and otherwise of 35 years. So they were looking for effectively a life sentence, as though Mr. Cannon had been convicted of the 25 murder charges he was found not guilty of. And I might add that the second most serious group of charges in this case, the only other group that related to the inherent danger of the drug, were 34 counts, counts 54 through 90, which related to 56 through 90, which related to charged creation of adulterated drugs compounded in in sanitary conditions. Those are the only two sets of charges that dealt with the inherent dangers of the drug, and Mr. Cannon was also found not guilty on each one of those 34 counts of adulterated drugs. So that is how we would compartmentalize the case. And the government's recommendation of 35 years, we believe, was in effect a proxy for its fervent desire to get him convicted on the murder charges, though they failed to do so. Now, in terms of the other point I wanted to make very quickly on USP versus SOPs, it is critical to look at the way this case was charged. I won't read it because I don't have time, but I originally wanted to look at paragraph 111 of the indictment. That is the purpose of the bail fraud scheme, and it has a litany of fraudulent representations made, in each case accompanied by a description of it being in violation of USP 797. Nothing related to SOPs. That was the way the case was charged, and that's the way the case should have been presented. Finally, Your Honor, I do want to... What kind of argument are you making there? I'm sorry? What kind of argument are you making there? I'm making the argument that pertains to our objection to the use of SOPs rather than USP. It's a 403? It's a 403 and not relevant evidence that should have been excluded by the judge as we requested that he do so. I wanted to touch briefly on the two enhancements at issue with my mind. Could you just touch on the harmlessness point about the SOP? The harmlessness? The government argued to us today in their brief that insofar as the SOP evidence should not have been brought in, it was harmless given the amount of evidence there was on the USP. It was not harmless, Your Honor, because almost all of the government's evidence that related to what they characterize as the pervasive contamination of 37 out of 38 weeks in 2012 were hits, environmental monitoring hits. That was their mantra throughout the case, reinforced by an extremely inflammatory showing in their closing argument of supposed violations. The idea that to the extent that there was weakness in showing transmission of the evidence of the violation of the USP, the inclusion of all the prejudicial and near view evidence of the SOP would create the potential that that would have led the jury to find fraud based on the USP because of the influence of the SOP evidence. I wish I had stated it that way myself, Your Honor. That is correct, yes. Could you just clarify one thing for me on the SOP evidence? What evidence in your view is there that the representation of general marketing materials about meeting and exceeding was conveyed to others either in general or specific? There were representations certainly about being USP compliant, but as I indicated earlier, in at least one marketing material there was a reference to exceeding USP standards. Was there any testimony that that representation was conveyed to actual customers?  Even though most accounts were entirely unaccompanied by any evidence of what representations were made, as we say in our brief, even where there was such a witness like Olson Chu on three of the Scott Connelly accounts, even his evidence, though he was the direct customer, fell short of what would be necessary for the foundation of no fraud accounts. May I have a minute to talk about the enhancements, if that's of interest to the court? Yes, please. Thank you. The first enhancement, these are two enhancements the government pressed. The court rejected both of them. It did so correctly. The first was the risk of death enhancement for an offense involving the conscious or reckless risk of death or serious bodily injury. I think this disputes the microcosm of the dispute about the case as a whole, and the fact that the jury found him not guilty of each count that related to inherent danger of the drug, both the murders and the adulterated drugs, speaks volumes about what it found there and undoes the argument for use of this precautionary enhancement. These enhancements, it's a preponderance of the evidence standard, right? Yes. So it's a very different standard. So the fact that the jury could not find beyond a reasonable doubt on certain predicates doesn't mean that they could not have found by the lesser standard that there was the reckless risk. That's correct, Your Honor, but the evidence was so woefully deficient in that, as the judge said, in terms of state of knowledge, it didn't even come close to meeting the state of knowledge that's required. And certainly that comment by the judge, I think, goes to the evidence of record relating to the risk of death enhancement. The other enhancement is the vulnerable victim enhancement, where the government seeks to object to the government's, the court's refusal to add an additional four points for many vulnerable victims. The problem of the, the court was correct in rejecting this. If we find that the court was incorrect in saying that the victims were solely the people who bought the materials, not the people who knew would be injected with the materials, doesn't that change all the sentencing calculation? It would not, Your Honor, because even if in that situation they were victims, they do not meet the requirements of vulnerable victims, which requires some special problem or illness that makes them especially vulnerable to be tried. The government would have had to put in evidence that victim X was particularly more vulnerable than the average person.  We said in some cases, and I'll agree for the proposition, that a general class of patients in a doctor-patient relationship, even where there is that direct communication, does not suffice to make the entire class of patients a vulnerable victim, and that's effectively what the government's trying to do here. All of these individuals were suffering physically. There's just something very counterintuitive about the suggestion that they were not victims. They're all suffering physically. They're not in a position to question the purity, the efficacy, the background of the medications. They're entirely dependent on others to vouch for the quality and efficacy of these drugs. So to suggest that they are not vulnerable in that sense, they're in need of relief, they're relying on others to testify to the safety of these drugs, how are they not vulnerable in exactly that sense? They're not in a position to protect themselves, and that's really what that enhancement's all about. If you're not in a position to be self-protective, you're vulnerable. I think the enhancement requires a great deal more than that, Your Honor, because the way you have described it would make, effectively, every patient in a doctor-patient relationship a vulnerable victim because they would be relying on the trust of the doctor. And what some courts have said is that it's a double counting of the abusive position of trust, which Mr. Cannon was hit for here. And so that would be a double counting and really an overlap of another enhancement. But they're not vulnerable victims, not because they didn't suffer. They suffered terribly and tragically, and nobody can dispute that and not have great empathy for that and compassion, but the way the government presented most significantly the evidence of the three survivors because they wanted to present as sympathetic a picture as possible were relatively young, healthy people with active lifestyles who really did not meet the criteria for a vulnerable victim. Thank you. Thank you, again. Thank you.